May it please the court, good afternoon. I am Greg Levin with the law firm of Motley Rice, South Pleasant, South Carolina, and we are serving as co-lead counsel here for the period of this class. This is an appeal of the dismissal of the security fraud complaint on the basis of the mere pleadings alone. Over the last 12 years this court has had occasion, several occasions actually, to remind litigants and lower courts that the determination of whether a claim is plausible is a context-specific inquiry that should be guided by common sense and judicial experience. This court, also in Yates, along with other courts of appeal actually, have also held that in assessing Sienta allegations holistically the inferential weight according to any specific discrete set of allegations should also be guided by common sense. We respectfully submit that that common sense reading of the complaint is absent from the district courts opinion. Let me start by... Let me make sure I understand where you're going with the common sense. I would agree, I wish it was, at least my idea, but you do have the Private Security Litigation Reform Act that imposes a hyphen pleading requirement here. Absolutely. So I'm not trying to throw you off, but I'm just, I like to speak in good terms, but common sense isn't always what you're going to get out of that if it's a hyphen pleading requirement. Well, that's true, Your Honor, but again, you know, the specific facts need to be read in a common-sense perspective. Let me give an example relevant to this case. Defendant Lowry was the architect of the cost-cutting or so-called workforce optimization strategy. He was narrating a quarterly update, in fact more than that, regarding the success or late success of that strategy. Okay, if you have a senior executive out there speaking, investors, case law says investors have a right to justifiably rely upon what senior executives are telling them. So with that background, if you're making specific statements about how wonderful things are within your organization, there are common-sense inferences that arise from that scenario. One, if you're making specific statements, logically you could be expected to have knowledge of the issues at hand. Otherwise, investors wouldn't be able to justifiably rely, but the case law says they can. So you're focusing, in this instance, there are a couple of issues here, at least from what I see it. C-enter is one, and then material misrepresentations or omissions. Yes. And address this C-enter aspect of this first. Okay, absolutely. Where I was going with my hypothetical was that it would be absurd to suggest that one does not have knowledge when one is making continual, repeated, specific statements about an issue. So we start with that part of the syllogism. I think the most important place I'd like to start on C-enter is motive. Now, motive isn't required, but it sure helps. That's a synopsis of what the Supreme Court has said. You've got a lot of insider trading here. Now, insider trading can be suspicious for a whole host of reasons. It can be suspicious because it's a large amount. It can be suspicious because it's ill or suspiciously timed. We've got both of those things here. You've got two executive defendants, one who sold 17% of their holdings during a nine-month class period, one who sold 77% of their holdings during a nine-month class period. We, I would submit, we've cited the cases that show that 17 and 77% are significant. District Court disagreed. I think that was an erroneous conclusion, particularly when viewed in light of the suspicious timing. Now, what happens? Mid-August, there's a media report about poor relations, poor operations within the delivery group, which is the largest group in the company, the one that's responsible for contract performance. What do the defendants do? They go into damage control mode, they start contacting analysts, and they try to get a positive spin out to the public, which they do. They engage Evercore, puts out a report on September 5th. So, you've got a bad media report on August 17th. 19 days later, there's a positive analyst report. What happens? The defendants go out and start immediately selling stock. Not insignificant shares of stock. For defendants left, it's a humongous chunk of that, of his holdings. Okay, so you've got timing and you've got amount. Now, what did the defendants do? Well, we're going to rely on three things. We're going to rely on the fact that, you know, 17.77% isn't a lot. I would submit the case law says otherwise. But more to the point, he also said, well, defendant Solaire, if you compare the eight- nine-month class period to the nine months before, he sold more during the control period. I will grant the district court that that conclusion was correct. However, he made no follow-up to Lowry. That's pretty powerful, isn't it? You know, you got to give everybody their due. And that, in and of itself, is a correct statement. I can't quibble with the math. What I can quibble with is that you can't pick and choose. If you're going to say that, well, I'm going to find persuasive the fact that Solaire sold more in the nine months before, than in the nine months of the class period, what do you do with Lowry? He sold nothing during the control period and sold all the shares during the class period. I would submit you can't have it both ways. Now, the reason I don't think... So, just so I make sure I understand where we are with all this, your response in regard, with respect to Judge Wynn's question about Sienter, is this whole timing and motive. Well, that's not the entirety of it. I think it's an important chunk of it. Uh-huh. Do you concede that any of the 38 statements about which you complain are forward-looking statements? Certainly, some of them are forward-looking. Not many of them, but there are a few. Yes, ma'am. Okay. So, can you list for me one that is forward-looking and then tell me how the at-bellies had actual knowledge that it was false? I don't have one. I'm looking... Okay, well... I don't have a specific example of the whole statement, but I can address the Safe Harbor, and then I'll go back to the answer to my training. On the Safe Harbor, where it all comes down to, is there are two independent problems? As this Court and the statute make clear, there is the, is there meaningful cautionary language, and was the statement made with actual knowledge? And for us to prevail on forward-looking statements, we have to prevail on both of those. I readily admit that. The problem with the district court's approach, and with the briefing filed by the defendants, is that that presumes that the universe of facts relevant to those problems don't overlap. If there was a Venn diagram, there would be an overlap between, logically, between those two problems. Let me tell you what I mean. I need a Venn diagram, actually, in this case. I'm sorry? I'd like a diagram. I said I would like a diagram, in this case. If I had known that in advance, Your Honor, I would have provided one. I might have gotten you a field of Judge Wynn's question, and I didn't want to... I'm sorry to interrupt your question, Judge Wynn, or the response to it, if you wanted to follow up. I think, at least, and I want you to tell me if I'm looking at this case correctly. You've got two essential categories under 10B you're looking at. One is Sienna, one is misrepresentation. We can bounce back and forth on it, but that gets a little confusing, and I was asking you to deal with Sienna, and I looked at what you did. It looks like you have about five categories that you list out. You just hit the one right there on insider trading, and so you got five to deal with those five here and amplify as to why they're there. When you go to the misrepresentation business, you won't get there if you don't win on Sienna, the way I see it. If there's not there, you won't have to deal with misrepresentation at all. So I think the challenge you have is, under those five, is to direct us to which one of those you think, well, I do think insider trading is the strongest one. I don't want to dwell on too much because I'm obviously down around five minutes, but the district court talked a lot about trading plans. The problem here is that the trading plan wasn't in the record. Now, the defendants chose to, as you can see from the size of the joint appendix, to submit dozens and dozens of exhibits. They didn't submit the trading plan. I have no doubt that the NB5-1 plan that you put it out predetermined. I mean, it's right there. Cases have used that. Absolutely, but where the cases have, the nuance is, the plans were in the record. You know, if we could see the plan and we would know when the plan was adopted, whether the plan was discretionary or non-discretionary, to get benefit of the defense, it needs to be non-discretionary. We don't know. There's a first-circuit case, Boston Scientific, it's cited in our briefing, which basically holds that, look, could it be a defense? Absolutely, it could be a defense. Do we know it's a defense here? No, because the plan is not in the record. I mean, this is akin to the rule that this court has established alongside many others, that when you move to dismiss on the basis of an affirmative defense, the affirmative defense needs to appear on the face of the court. So the fact that you have the plan, and there seems to be a plan, okay, maybe it's not dispositive, but you do admit that having a plan in place that we all agree they actually use, we may not know the timing or whatever, it weakens that inference of a fraudulent purpose, doesn't it? I'm not going to concede to that, Your Honor. I think Boston Scientific, which is the closest case at the appellate level on this issue, would actually help the other way, which is that it can be, but we can't make that finding, and nor should the district court have made that finding, without those critical facts. Now, so which of those other categories do you think is strong? You've given us the inside of trading. What's the other one, Hugh? Okay, let's start with access or knowledge of information directly contrary to the defendant's statement. Let's talk a little bit about Stephen Hilton. He was the head of the delivery division. Is this your core operations category? Well, no. Core operations was where I was going after Stephen Hilton. Okay, that's why I wanted to make sure it was clear. Knowledge of access to information would fall before Stephen Hilton. So with Stephen Hilton, he filed a breach of contract action. His allegations are incorporated in the complaint. He says, I told defendant Lowry that the pace of cuts were affecting customer satisfaction, and then shortly thereafter, defendant Lowry goes out and tells the public, all is well in the delivery division. Those allegations from Stephen Hilton are corroborated by various former employee accounts, and so those two merge together. The next thing would be core operations. Core operations was not even addressed. If you search for the word core in the district court opinion, you're not going to find it because it's not there. They say a key area has to do with the investment in employees. Now, I'm a firm believer that when you use the word of ordinary manner, it should get an ordinary meeting. So I went, in preparing for this, I went on means essential. Key means paramount. When something is a key area, there is with that a presumption that the people in the senior most positions know what's going on, and that's buttressed by the fact that, again, both of these defendants were the architects of the policy that we're talking about. And then lastly, there's this notion of temporal proximity. You've got that negative report in the media August 17th. Shortly thereafter, the company reaffirms guidance. Two months later, they start ratcheting it back. Common sense, going back to where I started, common sense will tell you that things do not go to hell in a handbasket overnight. These problems build up over time. And so courts have held that when there's like a three to six month period between... Is a 4% correction going to Hades in a handbasket? It seems like your timing point really depends on the significance of the change, doesn't it? Not necessarily. I don't think it's that factor alone. And, you know, we can start playing percentages. You know, would I rather have somebody on my baseball team who was one for two batting 500, or would I rather have somebody who's 28 for 100 who's batting 280? Well, the second guy, his batting average is lower, but he's had more experience than we're doing. It's a contextual thing. It's a materiality analysis. And this court has said that in most cases, materiality is not something we're going to determine on the basis of the pleadings alone. Right. That's not my... Yeah, that's not my point. My point is just you're trying to suss something out of the timing that there's... We can infer, scienter, and part from the timing. And I'm just pointing out your timing allegation depends on the significance, right? A company doesn't fall apart in a few months, but you might make minor adjustments based on new findings within a few months that it weakens the inference. No. Well, you know, other than the fact that the total dollar volume involved, and this is in our brief, the math is in there as well, was like a billion dollars. When you put all the numbers on the table, it's a billion dollars. Now, that may only be 4%, but I think investors find a billion dollar disparity to be significant. And we cite the cases in our brief about gross disparities between prediction and fact and so on as being relevant to the CNR analysis. And I would submit that you can't just look at percentages and percentages alone. And I see that I've gone over. Unless the court has any questions for me, I have reserved some rebuttal time and we'd be happy to answer further questions then. Thank you, Mr. Levin. Judges, if you do have further questions this time, or if not, we'll move to hear from the appellee. And if you will pronounce your last name, because I'm curious as to whether you pronounce it like mine, or is it like that stuff we drink? It's like the stuff we drink. So I'm not trying to pass judgment on which is better, but I happen to like the last name. All right. May it please the court, Jamie Wynne of Latham & Watkins on behalf of the appellees. I was going to start talking about material misstatements because I don't think, as the district court found, that they have sufficiently fled those. But given where the questions have focused, why don't I start with Sienta, the other basis for the district? Yeah, focus on the Sienta and look at the five categories that Mr. Levin has set forth, particularly the ones that you discussed, starting with insider trading. Absolutely. On the insider trading, as has been referenced, the court did look at that. The court did not think that the trading was suspicious, either in terms of timing, given the fact that Mr. Soleil had sold more stock in the control period prior to the class period, or an amount, and in particular, looking at Mr. Lowry's, given that he only traded 17%. And importantly here, are there Rule 10b-5-1 trading plans? They are referenced in public filings. They're non-discretionary trading plans. The reason they're not part of the record on appeal is that the plans themselves were not in any public filing. So on a motion to dismiss, we were all trying to look strictly at just what was in the pleadings and what was in the public record. So the fact of the plan is in the record, but the plans themselves aren't. We think that's fine. When you look at decisions like Yates, which is a circuit court for circuit opinion, it says it's quite appropriate to consider the existence of trading plans, even if they're entered into after the class period started. So whether it's before the class period or after the class period, they are relevant. They might hold more weight under certain circumstances, but they're still relevant when you're looking at whether these executives were purposely trying to manipulate results, you know, according to trading that they were doing. Here, the trading was pre-planned. They didn't have discretion over it. And it certainly factors into the analysis when you look at Sienter. The second thing that was mentioned today was the allegations of Steve Hilton. These come up both in Sienter and they're relevant if we're going back to the statement analysis. But for purposes of Sienter, you know, they really focused on their complaints on Hilton's employment complaint, which they just cribbed for purposes of their securities complaint. They didn't do any independent investigation of that. So we just have the allegations that are in the Hilton complaints and the termination letter that's referenced in that complaint. But even just looking at those allegations on their face, his allegations do not support the contention that DXC's actual cost cutting was causing problems at DXC, much less that those problems were known to defendants. To the contrary, when you look at that Hilton complaint, what he was alleging is that the costs implemented in his delivery division were in fact instrumental in the remarkable increases in earnings per share that DXC experienced in the first five quarters after the merger. And he says in his own complaint that these cost cutting measures were implemented with minimal negative impact to service quality. That's in his own allegations. His disagreement with Mr. Lowry in his wrongful termination suit were about additional proposed cuts that DXC never actually implemented. They were purely internal goals. And Hilton alleges only that he thought those theoretical or aspirational goals for cutting even more might have a detrimental effect on the company's performance. But the whole premise of his employment complaint is that everyone knew the cost cutting, cost reduction targets, the internal ones, were just aspirational and not implemented or ever meant to be implemented. So plaintiffs are taking those allegations out of context and they're saying something that's actually the opposite of what Hilton himself says in his employment complaint. The termination letter, the letter terminating Hilton, likewise fails to support plaintiff's claims here. Plaintiffs argue that the letter shows that Hilton was terminated because of the poor performance of his delivery division. But again, Hilton says the opposite. The whole thesis of his suit is that he and his division performed very well and that he shouldn't have been fired and therefore his termination was unjustified. When you look at the letter and it's in the record, the particular criticisms outlined in the termination letter are very personal and specific to Mr. Hilton. They're not about the delivery division as a whole. The letter says that he failed to achieve internal cost cutting goals, that he failed to personally develop a strong relationship with a large client, and that he engaged in insubordinate conduct which undermined company morale. Those are the reasons that are outlined in the letter for his termination. Again, very specific to him and not about the delivery division as a whole. As to the core operations theory, just saying that statements related to core operations cannot alone establish scienter. Plaintiffs would still have to show that defendants had actual exposure to information contradicting their statements about core operations, and plaintiffs have just failed to do that here. Yates talks about this. I commend you to look at Yates' decision because I think it's very important on a lot of these issues. The doctrine, the core operations doctrine, really only applies when it would be absurd to suggest that management didn't know of an issue, and here plaintiffs are trying to suggest that there were very specific things going on that were impacting the performance that weren't disclosed to the market, and they're just assuming that management knew. None of their allegations, including their former employee allegations, show this. They don't tie anything specific to what defendants actually knew, and so I don't think that holds water. Temporal proximity, again, we're just talking about a 4% reduction in the projections. They came out three months after the first quarter of 19 earnings were released, so you had a three-month time period, not a three-week time period like a lot of the what's really important to keep in mind here is that it's not a typical case of securities fraud where defendants were then trying to hide this from the market. They had the merger. They had a very successful fiscal year 18 where they met all of their goals and revenue projections. They then projected out for 19 a little bit more modestly. They met those goals in the first quarter of 19, and then they hit some bumps in the road for second quarter of 19, and they immediately disclosed those to the public. They immediately disclosed them. They said the reasons why they thought they were having execution problems, and they told the market. That is just not a case of securities fraud. You know what's interesting here is these are proving Sienta is a difficult thing to do, you know, listening to what's going on here because when you're looking at the Sienta requirement, you can go either intentional or reckless. Interesting enough, reckless looked like to me that really would be all but impossible to do, but the intentional aspect of it, you then look at it in a holistic way, and you sort of get the feeling of this is a really hard thing to do here because of given that just I guess the innocent presumption when you're looking at that comparative with the requisite one, which is an interesting comparative way of looking at this, and I don't know if it just seems to be particularly with the way Congress has moved this. It's really skewed in a way so that you really can't bring these unless you have something pretty solid. I'm almost wondering what does it take once you list five different categories, and then we go through each one, and basically what you concluded is that there's a weakening of this inference of a possible inference on purpose as a result of that, and then you look at them collectively in a holistic way, and you get the broad whole idea that, well, the presumption, at least the innocence inference seems to be a little bit more compelling than the requisite one on it, and then that's the end of the game, and I just wonder because you guys are the experts on this. We are experts on everything, of course, but really you're the true ones who do these cases, and in terms of bringing a case like this, I mean, what is it a plaintiff, what do they have to do? It makes me wonder. Under these particular facts where there is definitely something going on here, I mean, but that's not enough to get you there. I grant you that, but there's something going on when you do have some trading going back over, and I understand there's a plan, he said maybe you shouldn't say you should, and then you got all the other, the cooperation matter that comes up, and other matters on the elements of the SIEM that he contains or creates a problem, but when you come down to it, I'm just finding it's really kind of hard to bring these cases, and you probably don't disagree with that, do you? Look, it's a high standard, and I want to address everything that comes in with your question, so let me just acknowledge it is a high standard. I think there's a reason that the high standard was put into the PSLRA, and it's exactly for cases like this. We say there's a lot going on here. Well, actually what's going on is that there was just a miss in terms of the revenue productions, right? There was an unexpected business setback. That happens. Stocks can drop. Investors can be upset, and you can see that reflected in the stock price. That doesn't mean that there's been securities fraud, so really there is a heightened standard, particularly on Scienter, to show securities fraud, and just to review a little bit about it's not just the circuit, right? The Supreme Court in Telebs has said that you really have to have a strong inference that defendants intentionally or recklessly deceived, manipulated to fraud investors. There has to be a cogent and compelling inference or fraudulent intent. That inference, this is also in Telebs, must be at least as compelling as any opposing non-fraudulent intent inference, and so it is definitely a high standard. Now, you ask, you know, what could they do? Well, we do have lots of cases where the Scienter bar is met, right? You could have trading that's not according to a plan. You could have trading where the executives are just deciding on their own when to buy, when to sell, at what prices. It could be very suspicious when you look at the patterns in terms of statements they were making and timing of their sales. You could have restatements of financials, right, and an actual finding after the fact that what they were telling the public was actually wrong. We don't have anything like that here. There's no allegation that anything they actually said in terms of reported results was wrong. We have no restatement. We have no auditors coming in and saying what's going on here and questioning the executives, so we really don't have any of the indicia of Scienter that you might typically see, and something that I mentioned earlier as well, here we have a company, literally the first quarter that looked like, you know, they weren't going to perform the way they thought they were going to perform, came out and told the public. A lot of times you have them trying to hide it, trying to, you know, mask things, not be transparent with the public, and I think all that is really important here to show that in fact there is not a stronger inference of fraudulent intent that you have to conclude on this. Let me ask you regarding that inside trading category that was mentioned, do we know when those individual defendants entered into their rule 10 v5.1 stock plans? I happen to know it's not in the record. I'm happy to give you that answer if you want, but it's not in the record because it's not public. I can tell you the answer and then I can tell you why I think it doesn't matter either way. No, we don't need to know it if it's not in the record. That probably won't help us here. So let me just emphasize again. That's probably the question I want to make sure it's not in the record. We didn't miss that. Is that correct? The when is not in the record, but could I just emphasize again that whether it was before the class period or shortly at the start of the class period, that even according to Yates and other decisions, it can still be relevant to the analysis, right? So it can be relevant in terms of these were pre-planned. They weren't making decisions on their own as you go through the trade. But it wouldn't make a difference if it was in and to doing the class period, right? Depends. I mean, if it was at the outset of the class period, but before most of the statements were made, then that's going to be more relevant than if it were, you know, later in the class period. Okay. Again, I've mentioned Yates. It's a fourth circuit decision. I would really, like I said, commend you to look at it. This might just emphasize the challenges, Judge Wynn, that you're observing. But there in Yates, there were multiple restatements of the company's financial statements. There were former employees who had direct access to individual defendants and made allegations about specific meetings and documents pointing to the individual defendants and their knowledge of the issue that caused the restatements in that there was allegations in that case that the independent auditor had alerted the defendants to the issue. There was stock trading by six insiders with one trading as much as 80% of his shares, selling as much as 80% of his shares. And still the fourth circuit found that any inference of fraudulent intent could not overcome the more compelling inference of good faith conduct. You know, here, as I've said, we would argue that the non-fraudulent intent is overwhelmingly more plausible. It's simply not plausible and certainly not equally plausible that an inference of non-fraudulent intent that defendants would intentionally mislead their investors about DXE's business plan only to reveal the truth a few months later. There's just no reason that they would do that. And, you know, as I've said, the non-fraudulent inference here is exceedingly plausible and consistent with the facts given the performance in fiscal 2018, given the performance in the first quarter of fiscal 19, and the fact that they came out right, you know, at the start of the second quarter, right in the second quarter of 19, and told the public about the issues and then even still only reduced their revenue forecast by 4%. So we think on Scienter, it's just a clear winner under fourth circuit law. I'm happy to address, you know, the statements and the fact that many of them are forward-looking statements and puffery, which are protected. I don't know that we need to on the record, and I think we fully briefed it, but I'm happy to answer any questions if you all want to get into that now during argument. We do have your briefs on it, and their briefs are very thorough. I'll ask the judges, do you have any further questions of Ms. Wine? I don't. There being none, thank you. When you discuss the burden that plaintiff's lawyers have, you've just described the last 17 years of my life. It does make it challenging, it makes it very, very interesting, and I still get excited every day to wake up to go to work to do this. Well, to your credit, you're still doing it, so it might be something good about it. Much to my wife's chagrin, yes, I'm still doing it. But there's a lot packed into my esteemed colleague's presentation. Let me correct a couple of things. Counsel said that DXC immediately disclosed the problem. They immediately disclosed the problem. After the negative article in August, they tried to court analysts, and then they went ahead and traded stock. So it's not quite as innocent as saying immediately disclosed. But the burden is very high, but it's not insurmountable. And I think that it's worth saying, one, the Supreme Court of Tel Aviv, alongside the comparative analysis that was involved in the discussion you just had, it said no smoking gun is required. So I don't need to have the videotape. I don't need to have an admission to a criminologist or anything like that. So again, it's not insurmountable. And there's no need for us to plead a strong inference, not prove anything. But let me go back to the district court's opinion, which is why we're all here. There's a statement in his opinion, it's a JA 594, about what do these plaintiffs need to do at this stage. The statements, he says, must be both actually false and misleading, and defendants must know that those statements are so. Okay. Well, with regard to the statements being actually false and misleading, with the forward-looking ones, the non-forward-looking ones don't need to be actually false or misleading at the plea stage. This court in Hunter applied a reasonable belief standard. You can look for reasonable belief in the lower court standard. It's missing. And this court has acknowledged in Triangle of Capital, and Judge Wynn, I know you were on that panel, that severe recklessness suffices to plead Siena. So it doesn't need to be known that the statements are false. So we're starting with a district court opinion that basically ignores, I see your light on, Judge Wynn. Okay. That basically ignores two of this court's most relevant precedents. We talk about the 4%. And obviously, that's a point of contention between the parties. We've cut down a few trees in our briefs talking about it. But I would leave the court with this. If the 4% were material, then the stock wouldn't have dropped as much as it did. If it really was just 4%, and it was a blip on the radar screen, then the market would have yawned. The market didn't yawn. It didn't yawn because it thought it was important. Let me address the trading plans, and that probably will lead me to running out of time. Before or after does matter. Let me explain why. There's a good faith element of a 10B512 plan. That's why it's very, very hard to make an absolute defense argument on the pleadings, because good faith is typically a factual issue. If you enter into a plan at any time during the class period, when it's alleged that you had knowledge of what was going on, then you can't have entered into a plan without knowledge of non-public information. The two just can't be juxtaposed with one another. It does matter. It's not in the record. It does matter, but the district court made it matter. That's, in my view, a reversible error. Let me end with one other thing about the comparative analysis in Pell Labs. The comparative analysis in Pell Labs must be based on a factual edge. That is, the district court is free to look at reasonable inferences that can be concluded from the facts alleged. I helped write that complaint. The district court said, well, they had a genuine belief that their programs were going to work. That may very well turn out to be true after summary judgment and a trial, but we're not there. We're on the side. You can look at that complaint for a long time. Again, I helped write it. There's nothing there. There are no facts there for which you can infer the genuine belief that the district court found. Again, appellate courts play a very valuable role. They not only make the rules, but they need to make sure that the rules are followed, not only by litigants, but by lower courts. I would submit respectfully that that did not occur here. Unless the court has any additional questions, I will be quiet. Thank you, Mr. Levin. Judges, do you have any further questions? No. Well, I thank you, Mr. Levin. I thank you, Ms. Wine, for your presentations. The court will now adjourn and proceed to, at least for today, and proceed to our special room for deliberation. Thank you, both. Thank you again. Thank you. This honorable court.
judges: James Andrew Wynn, Stephanie D. Thacker, Allison J. Rushing